In the

# United States Court of Appeals

## For the Seventh Circuit

---

No. 24-1901

DEBRA PRATT,

*Plaintiff-Appellant,*

*v.*

WISCONSIN ALUMINUM FOUNDRY,

*Defendant-Appellee.*

---

Appeal from the United States District Court for the
Eastern District of Wisconsin.
No. 1:22-cv-00568 — **William C. Griesbach**, *Judge.*

---

ARGUED JANUARY 28, 2025 — DECIDED JULY 23, 2026

---

Before HAMILTON, KIRSCH, and MALDONADO, *Circuit Judges.*

MALDONADO, *Circuit Judge.* After reporting claims of discrimination and harassment at the Wisconsin Aluminum Foundry (WAF), human resources manager Debra Pratt found herself under attack. Other managers targeted her, she received a poor performance review, and after she complained about discrimination and retaliation, she was fired. Pratt sued, alleging sex discrimination, pay discrimination,

and retaliation. WAF said it fired Pratt because of the performance review as well as a lack of trust in Pratt's department and confidentiality issues. The district court granted summary judgment in favor of WAF on all of Pratt's claims.

We reverse in part. Pratt presented sufficient evidence of sex discrimination and retaliation under Title VII such that a reasonable jury could find in her favor on those claims. To be sure, WAF presented an alternative narrative that Pratt was fired for poor performance, but summary judgment is not the time to decide which narrative to believe. The time for weighing competing evidence is trial, and the job is for a jury not a judge. *See Wallace v. SMC Pneumatics, Inc.*, 103 F.3d 1394, 1396 (7th Cir. 1997) ("[C]ourts should be careful in a discrimination case as in any case not to grant summary judgment if there is an issue of material fact that is genuinely contestable, which an issue of intent often though not always will be."); *Johnson v. Advoc. Health & Hosps. Corp.*, 892 F.3d 887, 893 (7th Cir. 2018) ("As we have said many times, summary judgment cannot be used to resolve swearing contests between litigants." (citation omitted)). We agree with the district court, however, that WAF is entitled to summary judgment on Pratt's pay discrimination claim. Accordingly, we remand for trial on Pratt's sex discrimination and retaliation claims.

## BACKGROUND

The following facts are undisputed, except where otherwise noted, and viewed in the light most favorable to Pratt as the non-movant. *Gaddis v. DeMattei*, 30 F.4th 625, 628, 630 (7th Cir. 2022).

## I.  Factual Background

WAF is a family-owned aluminum foundry in Manitowoc, Wisconsin. Pratt began working for WAF in 2016 in the human resources department. In 2017, she was promoted to human resources manager. Her new responsibilities included developing and implementing personnel policies, maintaining personnel records, and responding to and investigating employee complaints.

The parties dispute the scope of her responsibilities for environmental health and safety, which bears on her pay discrimination claim. Pratt's predecessor performed those duties, but WAF contends that Pratt did not when she was promoted. A few months after Pratt was promoted, WAF hired Emery Coonen to be its Environmental Health and Safety Manager, and he took over these responsibilities. Coonen was hired at an annual salary of $85,328. Pratt's starting salary as HR manager was $65,016.

Pratt performed well in her first year as HR manager and received a bonus and a raise at the end of 2017, bringing her annual salary to $69,567. But she experienced some early setbacks. In early 2018, she committed errors on a benefits spreadsheet and did not catch a rate change for insurance premiums. She also filled a union position with an external candidate, which WAF contends violated its collective bargaining agreement.

Pratt also began to ruffle some feathers within the company by reporting concerns of discrimination and harassment to her supervisor, Ben Jacobs, WAF's Senior Vice President and Chief Product Officer. She believed her predecessor, who had been in the role for over thirty years, did not do enough

to investigate employee complaints. So, she took it upon herself to ensure that, under her direction, the department would take complaints seriously and report them to WAF leadership.

Between 2017 and 2018, Pratt reported multiple employee complaints of harassment and discrimination to Jacobs and other managers. Employees complained to Pratt about discrimination based on sex, race, ethnicity, and disability. She also shared with Jacobs her personal experiences as a female manager at WAF.

Eugene Boyd, WAF's Vice President of Operations, was the subject of many of these complaints. Pratt not only reported other employees' complaints about Boyd, but her own as well. For instance, in conversation with Pratt, Boyd referred to another female manager as a "bitch" and told Pratt he could "rile her up." Boyd also treated Pratt and her employees in the HR department—composed wholly of women—as secretaries, asking them to do menial tasks not related to their job duties.

One of Pratt's reports to Jacobs involved Boyd discussing a female employee's "ass" at a meeting. During that meeting, Boyd's female subordinate, Lili Goehring, remarked that she fell down the stairs and bruised her buttocks. The parties dispute what happened next, but they agree that Pratt later told Jacobs that, after Goehring's remarks, Boyd told Goehring to get up on the table and show him her "ass." One meeting attendee told Pratt that Boyd also stuck his thumb up on the table and told Goehring to "sit on it and he would spin her." Another attendee informed Pratt that while the jokes did not seem to bother Goehring, the innuendo made them uncomfortable.

After learning about this incident, Pratt prepared a written report for Jacobs summarizing her conversations with the witnesses who approached her. The report included her "findings," in which she wrote that the "sexual harassment" between Boyd and Goehring was her "biggest concern." She noted that the interaction "appear[ed] to be of a joking nature," but it was "still unprofessional and against the law." She advised that any witnesses to the interaction would "have the ability to file a sexual harassment complaint with the company as well as the EEOC" and that it "would be a difficult case to defend."

Pratt sent the report to Jacobs a few weeks later. She did not know, however, that Jacobs already had a copy of it. Another manager at WAF told Jacobs that he found the report on a copy machine near where Pratt worked. Jacobs was concerned that a confidential report was apparently left out in the open, so WAF engaged its outside counsel to investigate. The investigator spoke to Pratt, who admitted preparing the report but was surprised that someone else had found it. Pratt was later reprimanded for breaching confidentiality. Jacobs was also concerned about the way Pratt conducted her investigation before compiling the report, and she was given additional training on conducting and documenting HR investigations. Neither Boyd nor Goehring were disciplined for their part, although Jacobs testified they were given additional "training."

The problems with Boyd were not isolated incidents. The same female manager Boyd called a "bitch" complained to Pratt about Boyd barring her from necessary work meetings. Pratt reported another incident to Jacobs in which Boyd obscenely flipped off a female receptionist with his middle fin-

ger after she asked him to move his car from a visitor parking lot.

Pratt's reports to Jacobs also involved complaints of race discrimination, including a number complaining of Tom Culp, a white shift leader at WAF. Based on complaints she received, Pratt grew concerned that Culp treated his minority employees differently than his white employees and reported multiple incidents to Jacobs and to Boyd, Culp's supervisor.

Finally, Pratt also told Jacobs about her own experiences with discrimination and harassment at WAF. She reported that another manager called her a "cunt" and "bitch" because she asked him to sign a payroll change form. Pratt also reported that Boyd's subordinates hounded an HR employee for a date, and one of them sent her an email stating "U Smoken Hot." Pratt and the other employees in the HR department felt uncomfortable with these remarks and the email, and Pratt reported as much to Jacobs.

Pratt's reporting did not make her popular within the company. Jacobs testified that managers complained to him about the "direction" the HR department was moving in and expressed their distrust of Pratt. Suspicions about Pratt were later memorialized when she was reviewed by a third-party consulting group, Utech. Utech, which WAF engaged to help manage its growth, interviewed about 50 WAF employees and managers, including Pratt, about the strengths and weaknesses of the company and its leaders.

Utech compiled the employee feedback into a September 2018 report that identified strengths and weaknesses with WAF's culture generally. Utech noted that "[m]orale [had] gone downhill over [the] last 3 years," (predating Pratt's hir-

ing) and that there was a lack of trust and accountability. Further, Utech observed that "[t]he current culture at WAF is one of gossip and drama. Issues are avoided or talked about indirectly, causing more division within the organization. Sides are being taken, people are protective of their areas and people are really unsure who to trust . . . This starts with leadership."

Utech also provided individual feedback for WAF's managers, including Pratt, Boyd, and Jacobs. Under Pratt's strengths, the report said that she worked hard to "make things better" and knew her job well. The Utech report elaborated that "Deb hasn't been in her role long[,] yet is seen as trying to make improvements within the HR department and the organization, but has been met with some resistance." The report also said that Pratt lacked the trust of other employees who believed that she had a "hidden agenda," gossiped, and held grudges. The report further stated that many employees thought Pratt "[i]nvestigates people instead of focusing on what's best for the company."

The Utech report also criticized each of the other WAF managers. Some of the criticism was starkly similar to Pratt's. The report stated that employees did not trust Jacobs because, for example, he shared "information with others that was told to him in confidence." Employees at WAF also found that he lacked assertiveness. The report stated that Kory Brockman, WAF's Senior Vice President and Chief Financial Officer, had a "hidden agenda" and perpetuated "drama" within the company. Boyd, who was at a similar level within the organization as Pratt, received feedback that he lacked "respect and professionalism" and "instigate[d] and perpetuate[d] drama." The report stated that Tom Behnke, also at a similar

level, talked "badly about people" and could be "hot-headed and unprofessional." Of the 11 managers reviewed in the Utech report, Pratt was the only woman.

In November 2018, relying on the Utech report, Jacobs gave Pratt a yearly performance review. Out of a total possible score of 32, Pratt received a 10. Citing the Utech report, Jacobs wrote that Pratt had been a "very [divisive] figure at WAF." He also stated that while she was "good on the benefits side," she required more training on the "HR side." Because of her low score, Pratt did not receive a performance bonus for 2018 as she had in 2017.

Concerned with her score, Pratt met with Jacobs in December 2018 to ask for additional feedback. During that meeting, Pratt shared that she felt she was being retaliated against for making reports about harassment and discrimination, particularly her report about Boyd and Goehring. She felt like she had a target on her back.

Pratt was unsatisfied with Jacobs' response during that meeting and raised her concerns again in an email to Jacobs on March 7, 2019. She wanted specific examples of her work that warranted the low scores. In this email, she also expressed her concerns that Jacobs told other WAF employees not to approach her for HR purposes and that, by doing so, he was perpetuating a culture of distrust and gossip. She concluded by explaining that she felt she had been retaliated against because she reported the incident between Boyd and Goehring and could not "turn a blind eye" to it.

One week later, on March 15, 2019, Pratt was fired.

**II. Procedural History**

Pratt brought claims against WAF under Title VII for retaliation, sex discrimination, hostile work environment, and pay discrimination. The district court dismissed Pratt's hostile work environment claim at the pleading stage but allowed the remainder of her claims to proceed. Pratt does not challenge this dismissal on appeal.

After discovery, the district court granted summary judgment in favor of WAF on all the remaining claims. Applying *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), it concluded that Pratt could not state a prima facie claim for sex discrimination because she was not meeting WAF's legitimate performance expectations. As to Pratt's pay discrimination claim, the court concluded that she had not identified a sufficiently close comparator. Finally, on Pratt's retaliation claim, the court concluded that she did not engage in a protected activity.

## DISCUSSION

We review the district court's grant of summary judgment de novo. *Joll v. Valparaiso Cmty. Schs.*, 953 F.3d 923, 928 (7th Cir. 2020). Summary judgment is appropriate if there are no disputes of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56(a). In viewing the facts in the light most favorable to Pratt, we must "try to focus on the most persuasive story possible on [her] behalf when asking whether a verdict in her favor would be reasonable or could result only from irrational speculation." *Joll*, 953 F.3d at 928. At summary judgment, we are careful not to usurp the role of the jury. *See Wince v. CBRE, Inc.*, 66 F.4th 1033, 1041 (7th Cir. 2023) (We "try to discern what the record shows" to

ensure a plaintiff is not "wrongly deprived of a trial."). As long as there is "at least *one* reasonable way to tell the story in favor of" the non-movant, "a jury rather than appellate judges must choose among them." *Joll*, 953 F.3d at 935 (emphasis in original).

## I.   Title VII Sex Discrimination

In granting summary judgment to WAF on Pratt's Title VII sex discrimination claim, the district court concluded that she abandoned this claim because her arguments opposing summary judgment focused only on her retaliation claim. Arguments may be waived if they are "perfunctory and underdeveloped" or if they are so "unsupported by pertinent authority" that the court must conduct research and form arguments on behalf of the party. *United States v. Holm*, 326 F.3d 872, 877 (7th Cir. 2003) (citing *United States v. Berkowitz*, 927 F.2d 1376, 1384 (7th Cir. 1991)). Because waived claims cannot be considered on appeal, we do not find waiver lightly. If there is even "a (barely) adequate basis on which to follow [the] argument," we will not find waiver. *Id.*

Applying this principle, we disagree that Pratt abandoned her discrimination claim. Pratt's brief in opposition to summary judgment argued that WAF was not entitled to judgment on her discriminatory discharge claim and was sufficiently fleshed out over multiple paragraphs with citations to both record evidence and case law. She argued that her evidence was sufficient to meet each prima facie element of a discrimination claim. While some of these arguments bled into her retaliation arguments, that is no basis to find waiver of an entire claim. We therefore turn to the merits.

Title VII makes it unlawful for an employer to discriminate against an employee "because of" the employee's sex. 42 U.S.C. § 2000e-2(a)(1). Pratt sets out her arguments in the framework of *McDonnell Douglas*, but the question before us is simple: "whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge . . . ." *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 765 (7th Cir. 2016); *see also Tyburski v. City of Chicago*, 964 F.3d 590, 598 (7th Cir. 2020) ("A plaintiff may put forth and a court may analyze evidence using the *McDonnell Douglas* framework, but neither must do so."); *Skiba v. Ill. Cent. R.R.*, 884 F.3d 708, 720 (7th Cir. 2018) ("However the plaintiff chooses to proceed, at the summary judgment stage the court must consider all admissible evidence . . . ." (citation omitted)).

Here, as in many Title VII cases, the "sole question that matters" is causation: "whether a statutorily proscribed factor caused" a discharge. *Joll*, 953 F.3d at 929 (citation omitted). Put another way, the issue is whether the employer would have fired Pratt if she had been a man and everything else had remained the same. *Gehring v. Case Corp.*, 43 F.3d 340, 344 (7th Cir. 1994).

To assess causation in employment discrimination cases, we "ask whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 958 (7th Cir. 2021) (citing *Ortiz*, 834 F.3d at 765). "[A]ll evidence belongs in a single pile," *Ortiz*, 834 F.3d at 766, because "[d]irect as well as circumstantial evidence may support an inference of causation, and thus intent" in Title VII cases, *Joll*, 953 F.3d at 929 (citing *Ortiz*, 834 F.3d at 764); *see also Ames v. Ohio Dep't of Youth*

*Servs.*, 605 U.S. 303, 325 (2025) (Thomas, J. concurring) (quoting *Desert Palace, Inc. v. Costa*, 539 U.S. 90, 99 (2003)) ("That '[c]onventional rul[e] of civil litigation'—that a plaintiff can proceed with direct or circumstantial evidence—applies with full force to Title VII cases.").

"The reason for treating circumstantial and direct evidence alike is both clear and deep-rooted: 'Circumstantial evidence is not only sufficient, but may also be more certain, satisfying and persuasive than direct evidence.'" *Desert Palace*, 539 U.S. at 100 (quoting *Rogers v. Mo. Pac. R.R. Co.*, 352 U.S. 500, 508, n. 17 (1957)). The import of circumstantial evidence is especially acute in the employment discrimination context given that it is the rare discrimination case that might "permit easy inferences, such as the fabled employer who admits to firing an employee because of race." *Ortiz*, 834 F.3d at 765. Because "[f]ew discrimination cases are so straightforward—indeed they are often factually complex and require sifting through ambiguous pieces of evidence," *id.*, we have made clear that "[a] plaintiff may use circumstantial evidence to prove discrimination through a chain of inferences." *Downing v. Abbott Lab'ys*, 48 F.4th 793, 804 (7th Cir. 2022).

Broadly, three types of circumstantial evidence can support an inference of intentional discrimination: "[1] ambiguous or suggestive comments or conduct; [2] better treatment of people similarly situated but for the protected characteristic; and [3] dishonest employer justifications for disparate treatment." *Joll*, 953 F.3d at 929. Pratt has produced substantial evidence falling within each of these categories. Viewing this evidence holistically, we conclude that there is at least one reasonable way to tell the story in favor of her sex discrimination claim.

### A. Ambiguous or Suggestive Comments or Conduct

The record reflects the culture at WAF as one in which "suggestive comments" flowed freely. WAF does not dispute that men in managerial roles regularly made inappropriate comments and jokes to and at the expense of women employees. Pratt's own experience reflects this. She and her HR employees felt that they were treated like secretaries and not asked to perform their actual job duties because of their sex. Pratt also received pushback for reporting workplace harassment and discrimination and was called a "bitch" and a "cunt" for trying to do her job. Such offensive commentary is far from "suggestive." It is definitively sexist. *See Passananti v. Cook Cnty.*, 689 F.3d 655, 665 (7th Cir. 2012) (noting that "bitch" and "cunt" are "sexually degrading, gender-specific epithets" (citation omitted)).

Pratt reported this conduct to Jacobs repeatedly and he took little to no action to address it. Pratt's declaration that Jacobs "did not" address discrimination at WAF is particularly telling because Pratt, of all WAF employees, was best situated to know what actions Jacobs was or was not taking in response to reports. After all, she maintained personnel records and investigated complaints. At a certain point, a reasonable jury could view Jacobs' inaction as acquiescence, even tacit approval of the conduct Pratt experienced firsthand.[1]

---

[1] Our dissenting colleague suggests that Pratt's claim fails because Jacobs did not make any of the alleged sexist comments, and "stray remarks made by nondecisionmakers are not evidence that the decision had a discriminatory motive." *Post* at 33 (quoting *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 723 (7th Cir. 2001)). But *Crabtree* found only that the district court did not abuse its discretion by excluding, at trial, a single suggestive remark, made two years after the alleged adverse employment action. *See*

Culture is often set by those at the top. *See Burlington Northern & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 69 (2006) ("The real social impact of workplace behavior often depends on a constellation of surrounding circumstances." (citation omitted)). Considering Jacobs' senior executive role at WAF, a jury might reasonably deduce that he was influenced by this sexist environment, and in fact, had lent it his imprimatur by failing to intervene and address Pratt's complaints. *See Hasan v. Foley & Lardner LLP*, 552 F.3d 520, 528 (7th Cir. 2008), as corrected (Jan. 21, 2009) (courts are "not require[d]" to "ignore comments made by someone who is not directly responsible for an employee's supervision" especially where such comments "incited" discriminatory comments from other employees and "may have instigated" an employee's termination). Further, Jacobs had knowledge of his subordinates' bias and of their participation in the Utech report, but apparently—and in spite of Pratt's complaints to him on the subject—did not question whether the report could have been tainted by a broader culture of sexism at WAF. This is a theory of sex discrimination that we have blessed in the past. *See Perez v. Thorntons, Inc.*, 731 F.3d 699, 709 (7th Cir. 2013) (panel majority rejected dissent's argument that non-decisionmaker's sexist comments were "stray remarks" where those remarks did not "st[an]d alone," and the decisionmaker "was informed of [the non-decisionmaker's] bias," but "chose

---

261 F.3d at 723. *Crabtree* is silent on whether a panoply of sexist remarks and conduct by managers leading up to, and possibly contributing to a termination, can be considered on *de novo* review at summary judgment. *See id.; see also Hunt v. City of Markham*, 219 F.3d 649, 652–53 (7th Cir. 2000) (making clear that courts must take care not to over-read "stray remarks" cases).

to credit" the non-decisionmaker's account of the employee's alleged infractions).

As a result, a jury could find that because Jacobs relied on input he understood to be discriminatory and acceded to the discriminatory atmosphere, his own decision to discharge Pratt was made because of her sex. Context matters, and where derogatory comments do not stand alone, and are implicated within a larger web of investigations and complaints to decisionmakers, "we allow the jury to hear such evidence and weigh it for what it is worth." *Id.* at 710; *cf. Dey v. Colt Constr. & Dev. Co.*, 28 F.3d 1446, 1459 (7th Cir. 1994) (collecting cases) ("Summary judgment generally is improper where the plaintiff can show that an employee with discriminatory animus provided factual information or other input that may have affected the adverse employment action.").

In highly similar contexts, several of our sister circuits long have recognized the importance of assessing workplace culture in discrimination claims by considering discriminatory comments and actions by non-decisionmakers. *See, e.g. Merritt v. Old Dominion Freight Line, Inc.*, 601 F.3d 289, 301 (4th Cir. 2010) (reversing summary judgment for employer because, while the views/actions of other employees cannot be attributed to an ultimate decisionmaker, "at some point the corporate environment in which [the decisionmaker] worked places" the employment decision in a "less neutral context"); *Risch v. Royal Oak Police Dep't*, 581 F.3d 383, 393 (6th Cir. 2009) (reversing summary judgment for employer because "discriminatory remarks, even by a nondecisionmaker, can serve as probative evidence of pretext" and that type of circumstantial evidence may establish the evidence of a "discriminatory atmosphere"); *Brewer v. Quaker State Oil Refin. Corp.*, 72 F.3d

326, 333 (3d Cir. 1995) (reversing summary judgment for employer because, although "stray remarks by non-decisionmakers or by decisionmakers unrelated to the decision process are rarely given great weight," such statements "may provide some relevant evidence of discrimination" at trial). Because we treat the evidence holistically, we cannot ignore the environment Pratt worked in and must consider those facts in the light most favorable to her. *See Ortiz*, 834 F.3d at 766.

On its own, this discriminatory culture evidence may not be enough to conclude that Pratt's discrimination claim survives summary judgment. But viewed with the rest of the record evidence, the alleged sexist "remarks are part of the evidence of pretext that the jury should have the opportunity to weigh at trial." *Perez*, 731 F.3d at 710.

### B. Dishonest Justifications for Disparate Treatment

Pratt also presented evidence of "dishonest employer justifications for disparate treatment." *Joll*, 953 F.3d at 929. WAF claims it had three reasons for terminating Pratt in March 2019: (1) the negative feedback she received in the Utech report, particularly that employees did not trust her; (2) concerns about her ability to keep sensitive HR information confidential; and (3) errors she made in early 2018 related to a change in WAF's benefits plan for its employees and hiring an external candidate for a union position.

But none of these reasons compel us to rule for WAF as a matter of law. Some occurred a year before she was fired, and other employees who had similarly negative feedback in the Utech report received bonuses, not notices of termination. A reasonable jury could infer that these stated reasons were dis-

honest. Evidence of Pratt's performance issues does not justify automatically keeping her claims from a jury. "Federal employment discrimination laws do not limit their protection to perfect employees." *Paterakos v. City of Chicago*, 147 F.4th 787, 797 (7th Cir. 2025).

Starting with the Utech report, Pratt was the only woman reviewed in the report. Even though her negative feedback was not unique, she was the only one punished for it. Jacobs, Brockman, and Boyd, who all received negative feedback, some very similar to Pratt's, were rewarded with performance bonuses at the end of 2018. This differential treatment supports an inference that WAF's reliance on the Utech report to justify Pratt's termination is dishonest. *See Marnocha v. St. Vincent Hosp. & Health Care Ctr., Inc.*, 986 F.3d 711, 719 (7th Cir. 2021) (quoting *McDaniel v. Progress Rail Locomotive, Inc.*, 940 F.3d 360, 368 (7th Cir. 2019)) ("All things being equal, if an employer takes an action against one employee in a protected class but not another outside that class, one can infer discrimination.").

Regarding Pratt's handling of confidential information and early 2018 errors as justifications for WAF's decision to fire Pratt, both occurred nearly a year before she was fired. As for the union hiring issue, it is unclear from the record when this occurred. Beyond their staleness, these reasons are inconsistent with the feedback Pratt received; in her 2018 performance report, Jacobs stated that she was "good on the benefits side" and made no mention of issues with union hiring or confidentiality. WAF's reliance on this stale evidence and its conflict with Pratt's 2018 performance review combined with the culture evidence discussed above could lead a jury to conclude that the real reason for its decision to terminate Pratt

was based on her sex. *See Joll*, 953 F.3d at 932; *Loudermilk v. Best Pallet Co.*, 636 F.3d 312, 315 (7th Cir. 2011) (collecting cases) ("[A]n employer who advances a fishy reason takes the risk that disbelief of the reason will support an inference that it is a pretext for discrimination.").

### C. Better Treatment of Employees Outside Pratt's Protected Group

Pratt has also presented evidence of "better treatment of people similarly situated but for [her] protected characteristic." *Joll*, 953 F.3d at 929. Namely, the male managers in the Utech report. Pratt points to two similarly situated employees, Boyd and Behnke, both men, who were at a similar managerial level as Pratt, reported to the same supervisor, and were subject to the same feedback process through the Utech report. Even though Boyd and Behnke also received negative feedback, neither was disciplined or fired, and Boyd received a bonus in 2018. They therefore provide a "meaningful comparison" to Pratt "to permit a reasonable jury to infer discrimination." *Coleman v. Donahoe*, 667 F.3d 835, 841 (7th Cir. 2012).

While it is true that Boyd and Behnke were not HR managers like Pratt, we have been clear that a comparator need not be "identical." *Id.* at 846. Pratt must only point us to an analogue, not a twin. *See Johnson*, 892 F.3d at 895 (quoting *Coleman*, 667 F.3d at 841) (noting that *Coleman* "warned against using a mechanical 'magic formula' for the similarly-situated inquiry"). Here, it would be impossible to find Pratt's twin given that Pratt was the sole leader of WAF's HR department, and thus, no one else at WAF had the same job description as her (or, most likely, comparable experience, education, and other qualifications). We decline to read a gaping hole

into Title VII precluding executives, without direct professional peers, from proving their discrimination claims.

Because "this is not a hard and fast test . . . the requirement to find a similarly situated comparator is really just the same requirement that any case demands—the requirement to submit relevant evidence." *Id.* Here, the Utech report provides strong evidence that Behnke and Boyd are similarly situated comparators insofar as they were reviewed in the same category as Pratt under the same criteria. *See Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 810 (7th Cir. 2025) (relying on company's "annual performance assessment," which "assign[ed] employees to assessment groups based on similar roles and with similar experience, even if employees have different job titles, report to different supervisors, and work in different locations across the country" to identify similarly situated comparators). The Utech report grouped Boyd, Behnke, and Pratt in the "individual leaders" section and provided a review of each leader's strengths and weaknesses based on standardized interviews with the same staff members. The weaknesses identified for Boyd, Behnke, and Pratt centered around the same key issues: a purported penchant for drama, as well as a lack of professionalism. Boyd was said to "ha[ve] people do his dirty work," "be intimidating and aggressive," and "instigate[] and perpetuate[] drama." Behnke, meanwhile was said to "talk[] badly about people" and "be hot-headed and unprofessional." And Pratt was said to "ha[ve] a hidden agenda," engage in "[g]ossip and backstabbing," and "hold[] grudges against people." These reviews suggest a climate of distrust in Boyd's, Behnke's, and Pratt's departments at WAF.

Pratt has therefore provided us with "evidence about how [Boyd and Behnke] compared in the [Utech] assessment pro-

cess," as well as evidence "show[ing] that [Pratt, Boyd, and Behnke] were assessed unfavorably in comparison to others in their assessment group[]," namely, individual leaders at WAF. *Mitchell*, 143 F.4th at 812. Boyd and Behnke were not disciplined or demoted based on the Utech report's findings (like Pratt was).

Considering the totality of the evidence, there is "at least one reasonable way to tell the story" in Pratt's favor, supporting an inference that she was fired because of her sex. *Joll*, 953 F.3d at 935. And rather than "weigh[ing] any conflicting evidence" ourselves, we must allow a jury to connect the dots. *Omnicare, Inc. v. UnitedHealth Grp., Inc.*, 629 F.3d 697, 705 (7th Cir. 2011). Accordingly, WAF is not entitled to summary judgment on Pratt's Title VII sex discrimination claim.[2]

---

[2] Our dissenting colleague does not consider the totality of the evidence and instead insists that we are breaking "our rules on stray remarks, cat's paw liability, [and] hostile work environment." *Post* at 33. But we have made clear that to assess causation in employment discrimination cases, we "ask whether the totality of the evidence shows discrimination, eschewing any framework or formula." *Igasaki*, 988 F.3d at 958 (citing *Ortiz*, 834 F.3d at 765). The "sole question that matters" is "[w]hether a reasonable juror could conclude that [Pratt] would have kept [her] job if [s]he had a different [sex], and everything else had remained the same." *Ortiz*, 834 F.3d at 764. We stray from this fundamental inquiry and mistakenly step into the jury's role if we dismiss evidence as unworthy of our consideration because it does not fall neatly into a doctrinal bucket. After all, evidence that might support a discriminatory discharge might also support a hostile work environment claim, and vice versa. And evidence of other managers' remarks and biases might place Pratt's termination in a "less neutral context." *Merritt*, 601 F.3d at 301. We cannot disregard the cumulative impact of such evidence simply by isolating bits and pieces of evidence and labeling it as relevant only to one particular theory of dis-

## II.  Title VII Retaliation

We turn next to Pratt's retaliation claim. Pratt contends she was fired in retaliation for reporting harassment and discrimination at WAF and for complaining to Jacobs that she believed she was being retaliated against.

Title VII prohibits employers from "retaliating against an employee for opposing or participating in an investigation of an unlawful employment practice." *Lewis v. Wilkie*, 909 F.3d 858, 866 (7th Cir. 2018) (citing 42 U.S.C. § 2000e-3(a)). Our analysis focuses on one fundamental question: "could a reasonable trier of fact infer retaliation . . . ?" *Castro v. Devry Univ., Inc.*, 786 F.3d 559, 564 (7th Cir. 2015) (collecting cases). To prevail, Pratt must offer evidence that would permit a reasonable juror to find that: (1) she engaged in protected activ-

---

crimination. A jury must sort through and weigh all the evidence Pratt has put forward.

At any rate, this is not a stray remarks case. *See supra* at n. 1. This is also not a cat's paw case. Pratt does not suggest that Jacobs was an "unwitting manager" or an "unbiased individual" who terminated her solely because he was beguiled by Pratt's sexist coworkers, *Schandelmeier-Bartels v. Chicago Park Dist.*, 634 F.3d 372, 379 (7th Cir. 2011); instead, Pratt contends Jacobs knew of, and adopted, his colleagues' sexist bias. Last, while Pratt abandoned her hostile work environment claim on appeal, we need not put blinders on and automatically dismiss evidence merely because it more self-evidently fits into one sort of sex discrimination theory than another. *Cf. Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986) (acknowledging overlap between hostile work environment claim and sexual harassment claim). Rather, per *Ortiz*'s instruction, we consider all of the evidence "in a single pile," 834 F.3d at 766, and focus on "whether a statutorily proscribed factor caused" Pratt's discharge, *Joll*, 953 F.3d at 929. More precisely, we consider whether a reasonable jury considering all that evidence could reasonably find that the employer discharged Pratt because of her sex. The answer is yes.

ity; (2) she suffered an adverse employment action; and (3) a causal connection exists between the protected activity and that adverse employment action. *Gnutek v. Ill. Gaming Bd.*, 80 F.4th 820, 824 (7th Cir. 2023). There is no dispute that Pratt meets the second element; she was fired. We focus our analysis on the first and third elements.

### A. Protected Activity

For her claim to survive, Pratt must show that she sincerely and reasonably believed that she was reporting conduct prohibited by Title VII. *Castro*, 786 F.3d at 564. Her claim falls within the opposition clause in Title VII, which protects an employee who opposes "any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3(a). "Oppose" carries its ordinary meaning: "to resist or antagonize; to contend against; to confront; resist; withstand." *Crawford v. Metro. Gov't of Nashville & Davidson Cnty.*, 555 U.S. 271, 276 (2009) (citation modified). "When an employee communicates to her employer a belief that the employer has engaged in . . . a form of employment discrimination, that communication virtually always constitutes the employee's *opposition* to the activity." *Id.* (emphasis in original) (citation and internal quotation marks omitted).

Title VII does not just protect employees who can accurately divine whether a claim has merit before reporting it to a supervisor. Rather, it protects all who honestly and reasonably believe they are reporting prohibited conduct. On this point, the district court held Pratt to too high of a standard. It concluded that WAF was entitled to judgment on her retaliation claim because she did not engage in a protected activity. The court focused solely on Boyd's jokes to Goehring during the January 2018 meeting and concluded that those jokes were

not unwelcome or intended to harass and therefore did not amount to sexual harassment. But for a Title VII retaliation claim, we do not consider whether the reported conduct "was persistent or severe enough to be unlawful." *Magyar v. Saint Joseph Reg'l Med. Ctr.*, 544 F.3d 766, 771 (7th Cir. 2008). Whether Boyd's conduct constituted sexual harassment under Title VII "does not matter." *Castro*, 786 F.3d at 564. What does matter is that Pratt reasonably and honestly believed she was reporting prohibited conduct. *See id.*

Pratt honestly believed she was opposing unlawful behavior. In February 2018, Pratt wrote that the comments between Boyd and Goehring were "unprofessional and against the law" and that "any witnesses to [it] have the ability to file a sexual harassment complaint with the company." Her belief that this conduct was unlawful under Title VII was certainly sincere.

Her belief also appears reasonable. A joke about an employee exposing her buttocks or being told to sit on another employee's thumb might be considered actionable sexual harassment by some. Regardless of whether it was later determined that Boyd did not make the jokes, at the time she reported it, Pratt had a reasonable belief that she was reporting conduct prohibited by Title VII.

And this was not the only incident Pratt reported. She participated in a host of protected activity by repeatedly communicating conduct to Jacobs that she believed was prohibited under Title VII. She reported multiple instances where Boyd made inappropriate comments to women, including that he called another employee a "bitch," and that she believed he treated women employees worse than men. She also

reported another WAF manager for treating minority employees differently than white employees.

And not all of Pratt's reports were on behalf of other employees. She also reported that a male supervisor called her a "bitch" and a "cunt." It is not hard to understand how Pratt believed that the use of these blatantly sexist insults against her was more than just inappropriate. Nothing in the record suggests that Pratt did not honestly and reasonably believe she was reporting conduct prohibited by Title VII. *See Crawford*, 555 U.S. at 276.

In addition to these reports, Pratt twice told Jacobs that she believed she was being retaliated against: once during her performance review and again in an email one week before she was terminated. Between her reports and her personal complaints of retaliation, Pratt established that she had a reasonable and good faith belief that she was opposing unlawful conduct under Title VII.

In reaching the opposite conclusion, the district court adopted a unique retaliation rule applicable only to HR employees. Relying on an out-of-circuit case, *Littlejohn v. City of New York*, 795 F.3d 297, 318 (2d Cir. 2015), the district court concluded that in order to bring a retaliation claim, Pratt needed to show that she was not simply performing her job duties in passing along complaints, but that she was actively supporting other employees in asserting their Title VII rights or personally complaining about discriminatory conduct.

We are doubtful that *Littlejohn*'s heightened standard for retaliation claims by HR employees passes muster. By its text, Title VII requires only that Pratt oppose an unlawful employment practice. *See* 42 U.S.C. § 2000e-3(a) (making it "unlaw-

ful . . . for an employer to discriminate against any . . . employee[] . . . because he has opposed any practice made an unlawful employment practice by this subchapter"). We should not graft judge-made requirements onto the text requiring plaintiffs who work in HR departments to show "personal" opposition or "active[] support[]" of other employees. *See Littlejohn*, 795 F.3d at 318 (quoting *Sumner v. U.S. Postal Service*, 899 F.2d 203, 209 (2d Cir. 1990)). Further, the Supreme Court has never interpreted the opposition clause to be restricted to only certain types of employees. *See Crawford*, 555 U.S. at 276. To the extent WAF argues that policy considerations warrant an exception, such concerns "cannot override" the plain text of the statute. *Muldrow v. City of St. Louis*, 601 U.S. 346, 358 (2024). But we need not decide whether to accept the heightened standard in *Littlejohn* here. Pratt vigorously opposed conduct directed both at her and others.

WAF also argues that Pratt's evidence of reporting, which was mostly admitted through her affidavit filed in opposition to summary judgment, cannot be considered based on the sham affidavit rule. WAF argues that when asked in her deposition to identify all instances of discrimination and harassment that she reported to Jacobs, Pratt did not explain all of the incidents she later cited in her affidavit and never attempted to amend or supplement her testimony. Accordingly, WAF contends that Pratt may not rely on this evidence.

It is true that "a plaintiff cannot manufacture a genuine dispute of material fact by contradicting her prior deposition testimony with an affidavit." *Leibas v. Dart*, 108 F.4th 1021, 1026 (7th Cir. 2024). But an affidavit that "clarifies ambiguous or confusing deposition testimony" is permissible. *Perez v.*

*Staples Cont. & Com. LLC*, 31 F.4th 560, 570 (7th Cir. 2022) (citation omitted).

This is no sham affidavit. First, Pratt provided deposition testimony about many of these incidents that she reported to Jacobs. *See* R.33-1 at 46:1–47:1 (Pratt believed Culp engaged in racial discrimination); 56:7–57:16 (Boyd referred to Rabitz as a "bitch"); 202:6–8 (Behnke retaliated against an employee); 202:9–10 (Pratt believed Boyd was mocking her due to her sex); 203:1–204:14 (a manager sent an email to a woman employee in the HR department which stated "U Smoken Hot"); 208:18–209:5 (Pratt felt disrespected by Jacobs when he yelled at her and believed it was heightened due to her gender); 209:13–25 (women employees were being given secretarial work because they were women). To the extent there were any incidents that Pratt did not testify about in her deposition, her notes, which were available to counsel during her deposition, contained even more descriptions of reports that Pratt made to Jacobs.

Pratt therefore has met the first element of her retaliation claim. Whether this claim proceeds to trial thus depends on whether a jury could find that she established a causal connection between this protected activity and her termination.

### B. Causal Connection

The "key question" on causation is "whether a reasonable juror could conclude that there was a causal link between the protected activity or status and the adverse action." *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 924 (7th Cir. 2019). To establish that the protected activity caused the adverse employment decision, a plaintiff may offer evidence of "suspicious timing, ambiguous statements, behavior toward

or comments directed at other employees in the protected group, and other bits and pieces from which an inference of discriminatory intent might be drawn." *Boumehdi v. Plastag Holdings, LLC*, 489 F.3d 781, 792 (7th Cir. 2007). Of these, causation is most "frequently established by showing that there was a suspiciously short period of time between the employee's complaint and the adverse employment action." *Id.* at 793.

To establish a causal link between her protected reporting and her termination, Pratt cites the timing of her termination decision and the lack of non-pretextual explanations for it. As to timing, Pratt was fired one week after raising concerns about retaliation to Jacobs. This is certainly close enough in time to support an inference of causation.

But WAF contends that Jacobs decided to fire Pratt before she sent the March 7, 2019 email. In other words, WAF insists that Jacobs decided to fire Pratt before she engaged in any protected activity, and therefore the timing is not suspicious. WAF relies on Jacobs' declaration filed at summary judgment to support its argument. But this argument fails for two reasons.

First, the March 7, 2019 email is just one example of the protected activity that Pratt engaged in. She was a serial reporter of discrimination and harassment to Jacobs throughout her tenure as HR manager. Pratt also raised concerns about being retaliated against during her 2018 performance review, which occurred on December 8, 2018. This was still relatively close in time to her termination and could establish a sufficient causal connection. *Boumehdi*, 489 F.3d at 793; *see also Huff v. Buttigieg*, 42 F.4th 638, 650 (7th Cir. 2022) (whether five

months between protected activity and adverse employment action was suspicious timing was a question for the jury).

Second, Jacobs' declaration statement that he decided to fire Pratt before March 7 is in tension with his own deposition testimony. During his deposition, Jacobs could not remember when Pratt was fired. In his declaration, however, he states that he "made the decision to terminate Pratt's employment prior to March 7, 2019." One could argue that Jacobs' later-in-time recollection of the specific timing of the decision, without any corroboration, smacks of sham testimony that a jury should evaluate. Yet, even credited, Jacobs' declaration does not foreclose Pratt's causation theory because she engaged in a surplus of protected activity before March 7 too. At the very least, a question of fact remains as to when Jacobs made the decision to terminate Pratt in relation to all her protected activity. *See Perez*, 731 F.3d at 707 (genuine issue of fact existed where employer's statement of facts contradicted its own evidence).

Pratt also contends that her evidence of pretext supports the causal link. Specifically, she emphasizes that Jacobs wrote in her performance review that she was "good on the benefits side," but then cited issues with benefits as a reason for her termination. She also contends that no other employee who received negative feedback in the Utech report was terminated. If a Title VII retaliation plaintiff "offers specific evidence from which the finder of fact may reasonably infer that the proffered reasons do not represent the truth, the case then turns on the credibility of the witnesses." *Collier v. Budd Co.*, 66 F.3d 886, 893 (7th Cir. 1995). That is precisely the case here, and Pratt's retaliation claim therefore must survive summary judgment.

**III. Pay Discrimination**

Finally, we turn to Pratt's pay discrimination claim. Pratt identifies Emery Coonen as a comparator. She argues that even though her job duties initially included those of the environmental health and safety manager, when WAF later hired Emery Coonen to fill that role, he was paid more than she was, raising the inference that she was paid less because of her sex.

To establish a claim of pay discrimination under Title VII, Pratt must produce evidence that a similarly situated male employee was treated more favorably. *Johnson*, 892 F.3d at 895. While similarly situated means "directly comparable in all material aspects," the "proposed comparator need not be identical in every conceivable way," and courts "must conduct a common-sense examination." *Id.* (quoting *Reed v. Freedom Mortg. Corp.*, 869 F.3d 543, 549 (7th Cir. 2017) (internal quotation marks omitted)). We ask, "are there enough common features between the individuals to allow a meaningful comparison?" *Id.* (quoting *Coleman*, 667 F.3d at 841). Relevant evidence on this question includes whether the employees were supervised by the same person, were subject to the same standards, and engaged in similar conduct "without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Id.* (citation omitted).

The record in this case is simply too undeveloped for us to determine whether Coonen is a sufficient comparator. For example, neither WAF nor Pratt put forward any evidence that Pratt and Coonen were subject to similar or different workplace standards. The record is similarly devoid of any facts regarding whether Pratt and Coonen had similar qualifica-

tions and credentials, especially related to environmental health and safety. Pratt stated generally that Coonen was not more experienced or qualified than she was but did not provide any facts supporting this conclusion other than her belief. *See id.* at 895 ("Evidence of what has happened to other employees is only relevant if that employee is in the same boat as the plaintiff."). Accordingly, Pratt did not meet her burden to survive summary judgment on her pay discrimination claim.

## CONCLUSION

The grant of summary judgment for WAF on Pratt's pay discrimination claim is AFFIRMED. The grant of summary judgment for WAF on Pratt's claims for Title VII discrimination and retaliation is REVERSED and the case is REMANDED for trial on those claims.

KIRSCH, *Circuit Judge*, concurring in the judgment in part and dissenting in part. I agree with the majority that the Wisconsin Aluminum Foundry is entitled to summary judgment on Debra Pratt's pay discrimination claim. I disagree that her other claims warrant a trial. To salvage Pratt's suit, the majority ignores the distinction between direct discrimination and hostile work environment claims and creates a special comparator analysis for executives. A faithful application of our precedent should result in summary judgment for the Foundry. Sexist comments by non-decisionmakers, employees who weren't similarly situated to Pratt, and a delay between some of Pratt's failures and the decision to fire her do not add up to a Title VII discrimination claim. Similarly, Pratt's retaliation claim fails because she cannot show that WAF's stated, legitimate reasons for ending her employment were a lie.

I

For Debra Pratt's sex discrimination claim, the only question that matters is whether a reasonable factfinder could conclude that the Wisconsin Aluminum Foundry (WAF) fired her because she's a woman. *Ortiz v. Werner Enters., Inc.*, 834 F.3d 760, 766 (7th Cir. 2016); 42 U.S.C. § 2000e-2. On this record, no reasonable jury could make that finding.

A

The majority says that a jury could find a culture of sexism existed at WAF and that Senior Vice President Ben Jacobs condoned that atmosphere. *Ante*, at 13–16. But there's insufficient evidence to impute discriminatory motives based on other employees' conduct to Jacobs, who actually made the decision to fire Pratt. See *Coleman v. Donahoe*, 667 F.3d 835, 848 (7th Cir.

2012) (a discrimination claim "requires proof that the decisionmaker acted for a prohibited reason") (citation modified). Jacobs didn't participate in the problematic conduct Pratt reported on, and he didn't witness it. The majority reasons that perhaps biased employees provided feedback that informed the Utech report (which then informed Jacobs's decision), and that because Jacobs didn't take action to address the discriminatory conduct of other employees, he must have condoned it. *Ante*, at 13–15. This is speculation, and these are not reasonable inferences. See *Van Houdnos v. Evans*, 807 F.2d 648, 655 (7th Cir. 1986) (considering a claim for sexual discrimination under 42 U.S.C. § 1983 and observing that "Silence alone … is not evidence of discriminatory intent."); *E.E.O.C. v. Pipefitters Ass'n Loc. Union 597*, 334 F.3d 656, 660 (7th Cir. 2003) (applying Title VII and noting that "inaction, unless invidious, is not discrimination in any accepted sense of the term. Most people don't take active measures to combat discrimination; their inaction does not condemn them as discriminators.").

It should matter to us that Pratt isn't suing Eugene Boyd, the subject of many of her complaints. Instead, she's suing her employer—WAF. And in such a suit, Title VII requires Pratt to prove that WAF fired her because of her sex. See *Ortiz*, 834 F.3d at 765 (noting that the legal standard "is simply whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action"). To be precise, Pratt must show that discrimination was a motivating factor in WAF's decision. See *Comcast Corp. v. Nat'l Ass'n of Afr. Am.-Owned Media*, 589 U.S. 327, 337 (2020).

Ordinarily, when a plaintiff tries to prove discrimination through evidence about an employer's culture, we are considering a hostile work environment claim. And when a plaintiff attempts to prove direct discrimination by using the conduct or speech of non-decisionmakers, we apply our rules for stray remarks and cat's paw liability. The majority says this case is special—that it isn't governed by our rules on stray remarks, cat's paw liability, or hostile work environment. See *Ante*, at 13 n.1 & 20 n.2. But those rules should guide us here, and they demonstrate the ways in which the majority's novel theory about discriminatory culture evidence extends and disrupts our Title VII doctrine.

For instance, our law says that "stray remarks made by nondecisionmakers are not evidence that the decision had a discriminatory motive." *Crabtree v. Nat'l Steel Corp.*, 261 F.3d 715, 723 (7th Cir. 2001); see *Mlynczak v. Bodman*, 442 F.3d 1050, 1057–58 (7th Cir. 2006) (finding that a number of discriminatory comments made by a non-decisionmaker did not show that an employer discriminated); *Brooks v. Avancez*, 39 F.4th 424, 439–40 (7th Cir. 2022) (applying similar standards under the ADEA and ADA and concluding that discriminatory comments made by three employees did not "singularly influence[]" a decisionmaker to terminate an employee). And, under the cat's paw doctrine, to impute discriminatory remarks or conduct from Boyd and other WAF employees to Jacobs (the decisionmaker), Pratt must show that discrimination was the proximate cause of her termination, which requires "some direct relation between the injury asserted and the injurious conduct alleged," and excludes links that are "too remote, purely contingent, or indirect." *Staub v. Proctor Hosp.*, 562 U.S. 411, 419 (2011) (citation modified); see *Johnson v. Koppers, Inc.*, 726 F.3d 910, 915 (7th Cir. 2013).

Pratt cannot make that showing. Sexist comments made by WAF employees who had nothing to do with Pratt's termination are remote and indirect from the decision that matters—they are not a proximate cause of WAF's action. See *Staub*, 562 U.S. at 419; *Vega v. Chi. Park Dist.*, 954 F.3d 996, 1006 (7th Cir. 2020) (observing that proof of discrimination requires "a causal link between an employment decision made by an unbiased individual and the impermissible bias of a non-decisionmaking co-worker") (citation modified); *Rozumalski v. W.F. Baird & Assocs., Ltd.*, 937 F.3d 919, 925 (7th Cir. 2019) ("At a minimum, the person with discriminatory animus must influence the ultimate employment decision enough to be a 'proximate cause' of that action."); *Hunt v. City of Markham*, 219 F.3d 649, 652–53 (7th Cir. 2000) ("[T]he fact that someone who is not involved in the employment decision of which the plaintiff complains expressed discriminatory feelings is not evidence that the decision had a discriminatory motivation.") (citation modified).

Relying on precedent from outside our circuit, the majority undermines the causal relationship required by Title VII, reasoning that if enough non-decisionmakers make serious enough discriminatory comments, and a decisionmaker doesn't act or speak out in response, we can impute discriminatory motives to the decisionmaker. *Ante*, at 13–16. That approach ignores our precedent and collapses the distinction between a hostile work environment claim (which Pratt does not raise on appeal) and a claim for direct discrimination. See, e.g., *Alexander v. Casino Queen, Inc.*, 739 F.3d 972, 979–83 (7th Cir. 2014) (discussing the two theories); *Nat'l R.R. Passenger Corp. v. Morgan*, 536 U.S. 101, 115 (2002) ("Hostile environment claims are different in kind from discrete acts."). This case isn't like *Perez v. Thorntons, Inc.*, 731 F.3d 699 (7th Cir.

2013), either, because a biased non-decisionmaker in that case played a central role in the employee's termination. *Id.* at 709.

I agree with my colleagues that in discrimination cases, evidence (direct or circumstantial) must be considered as a whole. See *Ortiz*, 834 F.3d at 765. But not everything that happens at a workplace tends to show that an employer violated Title VII. As this court has considered discrimination claims, we've carefully drawn the line between evidence that proves that an employer discriminated and evidence that does not. We've drawn that line by distinguishing between claims for hostile work environment and direct discrimination, and by applying our rules for cat's paw liability and stray remarks.

My colleagues ignore that careful work. They assert that if evidence doesn't fit into a "doctrinal bucket" it must still be somehow relevant to our analysis. *Ante*, at 20–21 n.2. Yet we don't start with the assumption that all the evidence presented will support a plaintiff's claim—that's a determination we make now, in assessing whether WAF is entitled to summary judgment. According to the majority, this is the rare situation where evidence of discriminatory culture that doesn't involve a decisionmaker is relevant to a Title VII direct discrimination claim (rather than to a claim based on a hostile work environment). And they say this is the rare case where our usual doctrines for assessing that kind of evidence (stray remarks, cat's paw) aren't adequate. If that sounds suspiciously like cover for extending our law in new ways, that's because it is. Title VII imposes liability on employers only for their own deeds. See *Dunn v. Wash. Cnty. Hosp.*, 429 F.3d 689, 691 (7th Cir. 2005). That's why we focus on what motivates the decisionmaker who fires an employee—not what other biased employees may have said or done. It's undisputed that

Jacobs fired Pratt. And there is nothing to connect the sexism or discriminatory attitudes of other WAF employees to Jacobs. The evidence of sexist comments by others at WAF doesn't prove that Pratt was fired because she is a woman.

B

Disparate treatment can prove discrimination where employees (who do not share a protected characteristic) are similarly situated, but one was treated better. *Coleman*, 667 F.3d at 845–46. "Employees are similarly situated if they dealt with the same supervisor, were subject to the same standards, and had engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Dunlevy v. Langfelder*, 52 F.4th 349, 353 (7th Cir. 2022) (quotation omitted). While these requirements are well-established, my colleagues suggest that we may ignore them if an employee (here Pratt) has no "direct professional peers." *Ante*, at 19. The majority says that two employees at WAF—Eugene Boyd and Tom Behnke—were similarly situated to Pratt and received better treatment, because WAF's independent consulting review (the Utech report) criticized all three, but only Pratt was disciplined. *Ante*, at 18–20. Neither of these men is a suitable comparator, however.

Because WAF's outside consulting review looked at Pratt, Boyd, and Behnke, the majority assumes that they were subject to the same standards. But that's not right. To show that her comparators were subject to the same standards, Pratt needs to prove that she, Behnke, and Boyd worked under the same employment policies, and that their professional roles were not "so different from [Pratt's] as to render the compar-

ison effectively useless." *Coleman*, 667 F.3d at 848–49 (quotation omitted). Pratt cannot make that showing.

The Utech report was a one-off analysis conducted by an outside consulting firm: it wasn't an employment policy and didn't include a statement of standards explaining how employees were being assessed. Cf. *id.* (standards of conduct are policies or rules, set by the employer, that apply to employees). The report centered on feedback that was specific to each employee and their particular work areas. That matters because Boyd and Behnke did different work than Pratt: Boyd was a vice president, Behnke was a foreman, and Pratt was manager of HR. Cf. *Mitchell v. Exxon Mobil Corp.*, 143 F.4th 800, 804 (7th Cir. 2025) ("Assessment groups comprise employees in similar roles with similar experiences."). Position and rank can show that employees weren't subject to the same standards "provided that the employer took these factors into account when making the personnel decision in question." *Coleman*, 667 F.3d at 849–50 (quotation and emphasis omitted). WAF did that in Pratt's case—in her performance review following the Utech report, Jacobs gave Pratt low marks because "HR is supposed to be a safe confidential place for the organization, and I believed under Deb it was not [a safe space]." And Jacobs fired Pratt because of failings that were specific to her work in HR.

Nor did Pratt, Behnke, and Boyd engage in similar conduct. Pratt needed to prove that she and her co-workers "engaged in comparable rule or policy violations." *Id.* at 850 (quotation omitted). It's true that all three received negative feedback in the report, but every other employee did too—that was how the report worked. The negative feedback for these three employees wasn't comparable. The consultants noted

that others at the company didn't trust Pratt, that she conducted unnecessary investigations instead of focusing on what was best for the company, and that she had a hidden agenda. By contrast, Behnke was hot-headed, unprofessional, and protective of his people. Boyd was unprofessional, inexperienced, avoided responsibility, and lacked a leadership presence.

Even if receiving negative feedback in the Utech report for different reasons counts as comparable conduct (it doesn't), Pratt wasn't disciplined or fired only for the report's findings. Jacobs gave her a poor review because of the report, a lack of trust in Pratt's department, and confidentiality issues. He fired her based on a pattern of problems, of which the report was only one example. Pratt makes no argument that Behnke and Boyd had similar trust problems in their departments, or that they engaged in similar conduct that raised questions about their confidentiality.

In our circuit, we take a flexible and common-sense approach to identify suitable comparators in discrimination cases. *Coleman*, 667 F.3d at 846. But our law still requires that similarly situated employees be directly comparable to the plaintiff in all material respects. *Id.* (citation modified). When a plaintiff cannot make that showing, our job is to say so and consider the discrimination evidence that exists. The majority instead suggests that we should lower the bar for some special employees, and that refusing to do so would create a "gaping hole" in Title VII. *Ante*, at 18–19. But there's nothing unfair or unequal about applying Title VII consistently. If there's a gaping hole in our doctrine, it's the rule my colleagues write today—that we examine whether employees dealt with the same supervisor, were subject to the same standards, and en-

gaged in similar conduct without differentiating circumstances, except when doing so would leave an employee without a comparator. Pratt, Boyd, and Behnke weren't subject to the same standards, didn't engage in similar conduct, and aren't suitable comparators.

C

What's left of Pratt's sex discrimination claim? Just legitimate reasons for her termination. Pratt was fired because the organization wanted a change in HR leadership and because of ongoing performance problems: lack of trust, an inability to maintain confidentiality, the Utech report, an error related to a benefits plan, and the hiring of an external candidate for a union position.

That other employees weren't punished for negative feedback in the Utech report isn't suspicious. Pratt hasn't shown that she was comparable to any other employees considered in that report, or that other employees committed similar misconduct in addition to being written up by the consulting firm. Likewise, the fact that Pratt was told she was "good on the benefits side" at a performance review (which included largely negative feedback) three months before she was fired, isn't inconsistent with her subsequent termination. Pratt performed well in the benefits area at a time when she was performing poorly in general, but WAF cited a previous error in that part of her work when it terminated her.

Some of the reasons WAF gave for Pratt's termination weren't recent, but there's no rule requiring an employer to fire an employee as soon as they learn of mistakes or misconduct. Moreover, Jacobs decided to fire Pratt because of a pattern of problems, not because of any particular issue. Even if

some of the reasons cited were old, delay between cited misconduct and termination doesn't, standing on its own, prove that an employer is lying. See *Hitchcock v. Angel Corps, Inc.*, 718 F.3d 733, 737–42 (7th Cir. 2013) (reversing a grant of summary judgment when evidence of pretext included shifting, inconsistent explanations (some of which involved stale misconduct), an immediate change in treatment after learning of a pregnancy, and potentially offensive statements by a supervisor); *Peirick v. Ind. Univ.-Purdue Univ. Indianapolis Athletics Dep't*, 510 F.3d 681, 691–94 (7th Cir. 2007) (finding an employer's reasons pretextual when one of the reasons for termination was stale, the employee exceeded expectations, she wasn't warned about her misconduct, and management didn't discuss the employee's performance with her direct supervisor).

The majority seems to acknowledge that the evidence of sex discrimination in this case is entirely circumstantial. *Ante*, at 12. But without connecting Jacobs to others' sexually discriminatory conduct, absent meaningful points of comparison, and with no evidence that the company was lying, the circumstances of Pratt's firing do not show that she was discriminated against. No reasonable jury could find that Pratt was terminated because she is a woman.

## II

Pratt cannot succeed on her retaliation claim, either. Title VII prohibits firing an employee because she opposes an unlawful employment practice. 42 U.S.C. § 2000e-3(a). As to whether Pratt engaged in protected activity, I agree with the majority that we need not decide in this case whether an HR professional must show something more than that she was merely passing along complaints of discrimination affecting

others. See *id.* (protected action is opposition to "any practice made an unlawful employment practice by this subchapter"). Pratt opposed conduct that was directed at her. Rather, at issue is whether there's "sufficient evidence to permit a reasonable fact finder to conclude that retaliatory motive caused the discharge[.]" See *Igasaki v. Ill. Dep't of Fin. & Pro. Regul.*, 988 F.3d 948, 959 (7th Cir. 2021) (quotation omitted). Terminating an employee close on the heels of her protected activity can indicate that an employer's stated reasons for the firing are pretextual. See *Daza v. Indiana*, 941 F.3d 303, 309 (7th Cir. 2019). But suspicious timing alone is rarely enough, and usually requires other evidence to support the inference of a causal link. See *id.*

In this case, all we have is timing. Viewing the facts in the light most favorable to Pratt, WAF decided to fire her eight days after protected activity (the March 2019 email to Jacobs). There is no set legal rule for deciding when events are close enough together for an inference of causation to be drawn solely on the basis of suspicious timing. *Kidwell v. Eisenhauer*, 679 F.3d 957, 966 (7th Cir. 2012). In such a case, "we typically allow no more than a few days to elapse between the protected activity and the adverse action," but the inference still "depends on context." *Id.* (quotation omitted). Here, the gap between Pratt's email and the company's decision to fire her is small. But drawing an inference of causation in this case would be inappropriate given the context: a complete absence of other evidence of pretext, Pratt's poor performance review just a few months prior, and evidence that Pratt's performance issues were ongoing at the time of her termination. See *id.*

The majority says there's other evidence of pretext: that Jacobs told Pratt she was doing well handling benefits in December 2018 but cited a failure in that area when he decided to fire her, and that other employees received negative feedback in the Utech report but weren't fired. *Ante*, at 28. For reasons already discussed, I disagree. Neither Pratt's performance evaluation nor the experience of other, non-similarly situated employees shows that WAF lied about why it decided to fire Pratt.

Because "a suspicion is not enough to get past a motion for summary judgment," *Kidwell*, 679 F.3d at 966 (quotation omitted), I would affirm the district court's grant of summary judgment as to Pratt's retaliation claim.